UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION
_____

HURU CLARK,

          Plaintiff,          Case No. 1:20-cv-29

v.          Honorable Robert J. Jonker

GREGORY SKIPPER et al.,

          Defendants.
_____/

## OPINION

This is a civil rights action brought by a state prisoner under 42 U.S.C. § 1983. Under the Prison Litigation Reform Act, Pub. L. No. 104-134, 110 Stat. 1321 (1996) (PLRA), the Court is required to dismiss any prisoner action brought under federal law if the complaint is frivolous, malicious, fails to state a claim upon which relief can be granted, or seeks monetary relief from a defendant immune from such relief. 28 U.S.C. §§ 1915(e)(2), 1915A; 42 U.S.C. § 1997e(c). The Court must read Plaintiff's *pro se* complaint indulgently, *see Haines v. Kerner*, 404 U.S. 519, 520 (1972), and accept Plaintiff's allegations as true, unless they are clearly irrational or wholly incredible. *Denton v. Hernandez*, 504 U.S. 25, 33 (1992). Applying these standards, the Court will dismiss Plaintiff's complaint for failure to state a claim.

## Discussion

**I.    Factual allegations**

Plaintiff is presently incarcerated with the Michigan Department of Corrections (MDOC) at the Marquette Branch Prison (MBP) in Marquette, Michigan. The events about which he complains, however, occurred while Plaintiff was housed at the Michigan Reformatory (RMI)

in Ionia, Michigan. Plaintiff sues RMI Warden Gregory Skipper, RMI Inspectors B. Simmons and Unknown Bonn, and B. Travelby, the MDOC administrator charged with responsibility for approving or rejecting determinations that a prisoner belongs to a Security Threat Group (STG).

An STG is defined under MDOC Policy as "a group of prisoners designated by the Director as possessing common characteristics which distinguish them from other prisoners or groups of prisoners and which, as an entity, pose a threat to staff or other prisoners or to the custody, safety and security of the facility." Mich. Dep't of Corr. Policy Directive (PD) 04.04.113(B) (eff. Feb. 26, 2015). The policy provides for a Correctional Facilities Administration (CFA) manager who coordinates STG tracking and monitoring for the entire MDOC; in addition, the warden of each facility appoints a local STG coordinator for the institution. PD 04.04.113(H-I). A prisoner may be designated an STG I by the local STG Coordinator if there is sufficient documentation of the prisoner's membership in the STG and the prisoner fails to make a credible renunciation of his membership. PD 04.04.113(S). The CFA STG manager makes the final determination on designating a prisoner as an STG member. PD 04.04.113(T). A prisoner may be designated an "STG II" member if: (1) he is an STG I member and is found guilty of major misconduct related to his STG activity, (2) was previously an STG I member, and currently presents a threat to prisoners or staff, or (3) is identified as a leader, enforcer, or recruiter in an STG. PD 04.04.113(W).

A prisoner designated as an STG I member must be housed in security level II or higher. STG I prisoners are also subject to the following restrictions: prisoners are generally limited to three visits per month (the limit does not apply to counsel or clergy); classification to a school or work assignment only as approved by the CFA STG manager; no attendance at group meetings of prisoners, except for approved religious services; cell search at least once a week. PD

04.04.113(BB). A prisoner designated as an STG II member must be housed in security level IV or higher. STG II members are also subject to the following restrictions: prisoners are generally limited to two non-contact visits per month (the limit does not apply to counsel or clergy); classification to a school or work assignment only as approved by the CFA STG manager; no attendance at group meetings of prisoners, except for approved religious services; no participation in group leisure time activities, except for yard; cell search at least once per week; out-of-cell movement not to exceed one hour per day, excluding showers, meals, work, etc. PD 04.04.113(CC). Prisoners incarcerated at Level V are also subject to greater personal property restrictions than prisoners incarcerated at lower security levels. *See* PD 04.07.112.

Plaintiff alleges that an RMI corrections officer entered Plaintiff's cell on April 29, 2018, and removed a beard trimmer, multiple pieces of paper containing money transaction numbers, and two pieces of paper described as STG material. A couple of weeks later, Plaintiff was called to the control center. The same officer returned Plaintiff's trimmers, but also wrote Plaintiff a Class II misconduct for possession of the alleged money transaction numbers. Plaintiff acknowledges that he received Contraband Removal Records for the money transaction numbers and the two pieces of paper. The money transaction numbers were the subject of the misconduct; therefore, Plaintiff was provided a hearing with regard to that "contraband." Plaintiff was not afforded a hearing with regard to the two pieces of paper.

A few weeks after the misconduct report, on June 10, 2018, Defendants Simmons and Bonn filled out a form for the purpose of designating Plaintiff as a member of an STG, specifically as an STG II. Plaintiff claims that Defendant Skipper "approved Plaintiff being placed on STG II status. The next day, Defendant Simmons presented Plaintiff with paperwork, signed by Defendant Travelby, designating Plaintiff as an STG II for the reason that Plaintiff had

3

previously been designated as an STG member[1] and now presented a threat to the safety of staff and other prisoners, or the safety and security of the institution. Plaintiff was placed in segregation pending his transfer to MBP, a Level V correctional facility.[2] Plaintiff was transferred to MBP on June 18, 2018.

Plaintiff claims that the restrictive conditions of confinement imposed upon him because of the STG II designation are significant and atypical deprivations of his liberty and his property that occurred without due process in violation of the Fourteenth Amendment. Plaintiff seeks compensatory, punitive, and nominal damages as well as injunctive relief expunging his STG II status and ordering Defendants to place Plaintiff within his proper security level, whatever that might be.

## II.   Failure to state a claim

A complaint may be dismissed for failure to state a claim if it fails "'to give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). While a complaint need not contain detailed factual allegations, a plaintiff's allegations must include more than labels and conclusions. *Twombly*, 550 U.S. at 555; *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice."). The court must determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the

---

[1] The documents submitted by Plaintiff indicate that he had been previously "labeled STG II for four years [but then] renounced his affiliation and [was] no longer affiliated with the Gangster Disciples." (Segregation Classification Hr'g Report, ECF No. 1-6, PageID.50.)

[2] *See* Mich. Dep't of Corr., Policy Directives 05.01.130 ¶ B and 05.01.140 ¶ A (collectively describing the levels of prisoner security classification as Level I, Secure Level I, Level II, Level IV, Level V, and Administrative Segregation, with administrative segregation being the most secure).

4

reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 679. Although the plausibility standard is not equivalent to a "'probability requirement,' . . . it asks for more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—that the pleader is entitled to relief." *Iqbal*, 556 U.S. at 679 (quoting Fed. R. Civ. P. 8(a)(2)); *see also Hill v. Lappin*, 630 F.3d 468, 470-71 (6th Cir. 2010) (holding that the *Twombly/Iqbal* plausibility standard applies to dismissals of prisoner cases on initial review under 28 U.S.C. §§ 1915A(b)(1) and 1915(e)(2)(B)(i)).

To state a claim under 42 U.S.C. § 1983, a plaintiff must allege the violation of a right secured by the federal Constitution or laws and must show that the deprivation was committed by a person acting under color of state law. *West v. Atkins*, 487 U.S. 42, 48 (1988); *Street v. Corr. Corp. of Am.*, 102 F.3d 810, 814 (6th Cir. 1996). Because § 1983 is a method for vindicating federal rights, not a source of substantive rights itself, the first step in an action under § 1983 is to identify the specific constitutional right allegedly infringed. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). Plaintiff alleges that Defendants have violated his rights under the Due Process Clause of the Fourteenth Amendment.

### III. Due process

The elements of a procedural due process claim are: (1) a life, liberty, or property interest requiring protection under the Due Process Clause, and (2) a deprivation of that interest (3) without adequate process. *Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). "Without a protected liberty or property interest, there can be no federal procedural due process claim." *Experimental Holdings, Inc. v. Farris*, 503 F.3d 514, 519 (6th Cir. 2007) (citing *Bd. of Regents of State Colleges v. Roth*, 408 U.S. 564, 579 (1972)). Analysis of a procedural due

5

process claim involves two steps: "[T]he first asks whether there exists a liberty or property interest which has been interfered with by the State; the second examines whether the procedures attendant upon that deprivation were constitutionally sufficient." *Ky. Dep't of Corr. v. Thompson*, 490 U.S. 454, 460 (1989).

Plaintiff provides an extensive list of the changes in the conditions of his confinement that have followed his STG II designation. The Supreme Court long has held that the Due Process Clause does not protect every change in the conditions of confinement having an impact on a prisoner. *See Meachum v. Fano*, 427 U.S. 215, 225 (1976). In *Sandin v. Conner*, 515 U.S. 472, 484 (1995), the Court set forth the standard for determining when a state-created right creates a federally cognizable liberty interest protected by the Due Process Clause. According to the *Sandin* Court, a prisoner is entitled to the protections of due process only when the sanction "will inevitably affect the duration of his sentence" or when a deprivation imposes an "atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." *Sandin*, 515 U.S. at 486-87; *see also Jones v. Baker*, 155 F.3d 810, 812 (6th Cir. 1998); *Rimmer-Bey v. Brown*, 62 F.3d 789, 790-91 (6th Cir. 1995). The *Sandin* Court concluded that mere placement in administrative segregation did not implicate a liberty interest because the segregation at issue in that case did not impose an atypical and significant hardship. *Sandin*, 515 U.S. at 484; *Wilkinson v. Austin*, 545 U.S. 209, 222-23 (2005).

The deprivations of which Plaintiff complains fall into two general categories: (A) limitations on the amount of property that Plaintiff can keep in his cell; (B) more restrictive conditions of confinement because he is in a Level V facility and because he carries the STG II designation.

### A. Deprivations of property

Plaintiff claims that he was deprived of the "two pieces of paper" without a hearing. Additionally, Plaintiff alleges that he "has lost property without due process of a hearing . . . because of being placed within a Level V Security [Facility]." (Compl., ECF No. 1, PageID.12.) Plaintiff does not identify the specific property he has lost by virtue of the increase in security level. Instead, he invites the Court to compare the list of property a Level V prisoner is permitted to purchase and possess (*Id.*, PageID.12-16) with the more extensive lists of property that a Level I, II, or IV prisoner is permitted to possess (*Id.*, PageID.16-27). Thus, it is not clear if Plaintiff has actually had property taken or what property was taken from Plaintiff.

#### 1. Two pieces of paper

Plaintiff's claim that he was deprived of the two pieces of paper without due process is barred by the doctrine of *Parratt v. Taylor*, 451 U.S. 527 (1981), *overruled in part by Daniels v. Williams*, 474 U.S. 327 (1986). Under *Parratt*, a person deprived of property by a "random and unauthorized act" of a state employee has no federal due process claim unless the state fails to afford an adequate post-deprivation remedy. If an adequate post-deprivation remedy exists, the deprivation, although real, is not "without due process of law." *Parratt*, 451 U.S. at 537. This rule applies to both negligent and intentional deprivations of property, as long as the deprivation was not done pursuant to an established state procedure. *See Hudson v. Palmer*, 468 U.S. 517, 530-36 (1984). Because Plaintiff's claim is premised upon allegedly unauthorized acts of the Defendants, all state officials, he must plead and prove the inadequacy of state post-deprivation remedies. *See Copeland v. Machulis*, 57 F.3d 476, 479-80 (6th Cir. 1995); *Gibbs v. Hopkins*, 10 F.3d 373, 378 (6th Cir. 1993). Under settled Sixth Circuit authority, a prisoner's failure to sustain this burden requires dismissal of his § 1983 due-process action. *See Brooks v. Dutton*, 751 F.2d 197 (6th Cir. 1985).

Plaintiff has not sustained his burden in this case. Plaintiff has not alleged that state post-deprivation remedies are inadequate. Moreover, numerous state post-deprivation remedies are available to him. First, a prisoner who incurs a loss through no fault of his own may petition the institution's Prisoner Benefit Fund for compensation. Mich. Dep't of Corr., Policy Directive 04.07.112, ¶ B (effective Dec. 12, 2013). Aggrieved prisoners may also submit claims for property loss of less than $1,000 to the State Administrative Board. Mich. Comp. Laws § 600.6419; MDOC Policy Directive 03.02.131 (effective Oct. 21, 2013). Alternatively, Michigan law authorizes actions in the Court of Claims asserting tort or contract claims "against the state and any of its departments, commissions, boards, institutions, arms, or agencies." Mich. Comp. Laws § 600.6419(1)(a). The Sixth Circuit specifically has held that Michigan provides adequate post-deprivation remedies for deprivation of property. *See Copeland*, 57 F.3d at 480. Plaintiff does not allege any reason why a state-court action would not afford him complete relief for the deprivation, either negligent or intentional, of his personal property. Accordingly, Plaintiff's allegations regarding the deprivation of his two pieces of paper without due process of law fail to state a claim.

### 2. Property restrictions for Level V inmates

As a prisoner moves up the security levels in the MDOC, under PD 04.07.112, the property he or she is permitted to keep in her cell is restricted. For that reason, Petitioner suggests that his assignment to a Level V facility deprived him of property.

The policy is implemented at the higher security level facility as follows:

> Once unpacked at the receiving facility, staff shall determine which items are allowed at that security level and return all allowable property to the prisoner within one calendar day after its arrival at the receiving facility. If the prisoner's property exceeds allowable limits, the prisoner shall be given a reasonable opportunity to exchange an allowable item with an item that did not fit within property limits prior to disposal of the excess property. Items not allowed at the receiving facility based solely on the security level of that facility shall be disposed of only as set forth in

> Paragraph MM . . . . Although a hearing is not required, the prisoner's preferred disposition shall be considered.

PD 04.07.112 (AA). Under Paragraph MM, the excess property can be mailed out of the facility at the prisoner's direction and expense; retained and stored for 30 days for pick-up by the prisoner's designee; donated to charity; or destroyed. The fact that Plaintiff maintains ownership of the property even though he cannot keep it in his cell or in the facility means he has not been deprived of the property. *See Hunt v. State of Michigan*, 92 F. App'x 300, 301 (6th Cir. 2004) (citing *Hatten v. White*, 275 F.3d 1208, 1210 (10th Cir. 2002) ("While an inmate's ownership of property is a protected property interest that may not be infringed without due process, there is a difference between the right to own property and the right to possess property while in prison. [citations omitted. Plaintiff] was allowed to send the property he could not possess in prison to a place of his choosing, and therefore was not deprived of the property.")) Accordingly, there is no deprivation of property here that is protected by due process.

Though Plaintiff has not been deprived of ownership of his property, he has been deprived of its use. Denying Plaintiff the use of his property might be construed as a deprivation of liberty; but, that deprivation does not affect the duration of Plaintiff's sentence nor is it atypical and significant in relation to the ordinary incidents of prison life. *Cosco v. Uphoff*, 195 F.3d 1221, 1224 (10th Cir. 1999) ("The regulation of type and quantity of individual possession in cells is typical of the kinds of prison conditions that the Court has declared to be subject to the . . . analysis set forth in *Sandin*."); *Blanton v. Caruso*, No. 1:10-cv-1187, 2011 WL 202094, at *3 (W.D. Mich. Jan. 19, 2011) (limitation on in-cell property is not atypical and significant). Therefore, under *Sandin*, the deprivation does not warrant due process protection.

Moreover, while inmates retain constitutional rights consistent with their imprisonment, prison officials may impinge on these constitutional rights if the regulation "is

reasonably related to legitimate penological interests." *See Turner v. Safley*, 482 U.S. 78, 89 (1987). To determine whether a prison official's actions are reasonably related to a legitimate penological interest, the Court must assess an official's actions by reference to the following factors: (1) whether there exists a valid, rational connection between the prison regulation and the legitimate governmental interest; (2) whether there remain alternative means of exercising the right; (3) the impact that accommodation of the asserted constitutional right will have on guards and other inmates, and on the allocation of prison resources generally; and (4) whether there are ready alternatives available that fully accommodate the prisoner's rights at de minimis cost to valid penological interests. *Turner*, 482 U.S. at 89-90.

The policy in issue expressly states the reason for restrictions on in-cell property: "Excessive prisoner property in housing units constitutes a fire hazard and creates sanitation, housekeeping, and security concerns." PD 04.07.112 Policy Statement. Other courts have recognized as legitimate similar penological interests in limiting the amount and kind of property stored in prisoner cells.

> Security concerns demand the regular search of inmate cells and an unlimited amount of . . . property items would place an excessive burden on staff when conducting such searches. Property-related security concerns include theft, bartering, misuse of property to fashion weapons, using property to hide contraband, and utilizing property to signify gang affiliation. Additionally, health and safety concerns arise from allowing cluttered cells, which can lead to unsanitary conditions and possible fire hazards. *See Joseph v. Campbell*, 10 F. App'x 264 (6th Cir. 2001) (holding that the restriction on inmates' use of oils was rationally related to a legitimate penological interest in security because oils are flammable and could be used to mask the odor of drugs, and not in violation of the First Amendment because inmates had an alternative means of using oils through religious volunteers visiting the prison.)

*Abdullah v. Anderson*, No. 5:05-cv-568, 2008 WL 4103980, at *13 (S.D. W. Va. Sept. 2, 2008) (discussing limitation on in-cell property, despite declared desire to use property for religious purposes); *see also Bell v. Wolfish*, 441 U.S. 520, 553 (1979) (recognizing legitimate governmental

10

interests in restricting total property for storage and sanitation reasons and potential theft); *Dearing v. Weaks*, No. 18-4173, 2019 WL 6464017, at *3 (6th Cir. July 15, 2019) (upholding legitimate interest in restricting certain property to limit, inter alia, "'[t]he potential to start a fire in a cell, flood toilets, or other destruction of institutional property[.]'" (quoting Oh. Dep't of Rehab. & Corr. Policy 61-PRP-01(VI)(A)(9))); *Simpson v. Director*, No. 4:15cv644, 2017 WL 1022783, at *2-3 (5th Cir. Mar. 16, 2017) (holding that prison policy of restricting storage space for legal and religious property was reasonably related to legitimate penological purpose of maintaining prison security); *Ford v. Schmidt*, 577 F.2d 408, 410 (7th Cir. 1978) ("[P]rison officials may, as a condition of confinement, establish rules and regulations concerning the possession of property by inmates."); *Koger v. Dart*, No. 14 C 6361, 2019 WL 4261201, at *5 (N.D. Ill. Sept. 9, 2019) (addressing legitimate penological interests in in limiting written materials for safety and security, sanitation, and ease of searches); *Garrett v. Gilmore*, 926 F. Supp. 554, 557 (W.D. Va. 1996) (finding legitimate penological interest in fire safety and accessibility in limiting personal property), *aff'd* 103 F.3d 117 (4th Cir. 1996).

Further, Plaintiff's request that prison policy place no limits or restrictions on the amount of property that a prisoner may maintain in his cell would wholly undercut any ability for the prison to maintain order and sanitation and would prevent officers from performing routine searches efficiently, given the amount of property they would have to review to find contraband. Finally, in light of Plaintiff's implicit demand to keep unlimited property, no readily apparent alternatives would fully accommodate his asserted right at a *de minimis* cost to officials and the institution.

In summary, the policy limits on in-cell personal property at a Level V facility have not deprived Plaintiff of property; the limits have not deprived Plaintiff of a liberty interest that is

protected by due process; and, to the extent the limits impinged on a constitutional right, that impingement is authorized under the *Turner v. Safley* analysis. Accordingly, Plaintiff has failed to state a constitutional claim arising from the Level V property restrictions.

### B. Restrictive conditions in a Level V facility as an STG II

Plaintiff is subject to many new restrictive conditions of confinement—not just in-cell property restrictions—as a result of the STG designation. Some restrictions follow from the fact that he is now housed in a Level V facility.[3] Others follow specifically because he is designated STG II. Whether the restrictive conditions of which Plaintiff complains arise from his Level V security classification or his STG II designation, they do not constitute a deprivation of liberty without due process of law. Therefore, he has failed to state a claim.

The Supreme Court repeatedly has held that a prisoner has no constitutional right to be incarcerated in a particular facility or to be held in a specific security classification. *See Olim v. Wakinekona*, 461 U.S. 238, 245 (1983); *Moody v. Daggett*, 429 U.S. 78, 88 n.9 (1976); *Meachum v. Fano*, 427 U.S. 215, 228-29 (1976). Prisoners cannot "have a protected liberty interest in the procedure[s] affecting [their] classification and security, because the resulting restraint, without more, [does] not impose and 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Cash v. Reno*, No. 97-5220 1997 WL 809982, at *1 (6th Cir. Dec. 23, 1997); *see also Morris v. Metrish*, No. 97-1624, 1998 WL 246454, at *2 (6th Cir. May 5, 1998); *Moore v. Sally*, No. 97-4384, 1999 WL 96725, at *1 (6th Cir. Feb. 3, 1999). Without such

---

[3] It is difficult to determine whether Plaintiff contends that he has been deprived of liberty without due process as a result of those changes that follow from his placement in a Level V facility as separate and distinct from those changes that follow the STG designation. On the one hand, Plaintiff indicates that he "does not challenge the increase in classification as a result of the STG designation." (Compl., ECF No. 1, PageID.28.) On the other hand, the property limits of which he complains apply to all Level V prisoners, not just those designated STG II.

a protectible interest, Plaintiff cannot successfully claim he has been denied due process, because "process is not an end in itself." *Olim*, 461 U.S. at 250.

The Sixth Circuit has followed the Supreme Court's rulings in a variety of security classification challenges. For example, in *Guile v. Ball*, 521 F. App'x 542 (6th Cir. 2013), the Sixth Circuit rejected Plaintiff Guile's claim that his designation as a homosexual predator and consequent transfer to a Level V facility with more restrictive conditions resulted in an atypical, significant deprivation. 521 F. App'x at 544; *see also O'Quinn v. Brown*, No. 92-2183, 1993 WL 80292, at *1 (6th Cir. Mar. 22, 1993) (designation as homosexual predator and assignment to Level IV facility with additional restrictions did not implicate a protected liberty interest).

Plaintiff's STG II designation is, in effect, just another type of security classification. *Harbin-Bey v. Rutter*, 420 F.3d 571, 577 (6th Cir. 2005). Because the restrictions are more severe than those that apply to Level V prisoners generally, however, additional scrutiny of their significance and typicality is appropriate.

In *Wilkinson v. Austin*, 545 U.S. 209 (2005), the Supreme Court took a closer look at the restrictive conditions of confinement that followed classification to the highest security— "Supermax"—prison in Ohio:

> Conditions at OSP[, the "Supermax" facility,] are more restrictive than any other form of incarceration in Ohio, including conditions on its death row or in its administrative control units. The latter are themselves a highly restrictive form of solitary confinement. *See Austin I, supra*, at 724-725, and n.5 (citing Ohio Admin. Code § 5120-9-13 (2001) (rescinded 2004)). In OSP almost every aspect of an inmate's life is controlled and monitored. Inmates must remain in their cells, which measure 7 by 14 feet, for 23 hours per day. A light remains on in the cell at all times, though it is sometimes dimmed, and an inmate who attempts to shield the light to sleep is subject to further discipline. During the one hour per day that an inmate may leave his cell, access is limited to one of two indoor recreation cells.
>
> Incarceration at OSP is synonymous with extreme isolation. In contrast to any other Ohio prison, including any segregation unit, OSP cells have solid metal doors with metal strips along their sides and bottoms which prevent conversation or communication with other inmates. All meals are taken alone in the inmate's cell

13

> instead of in a common eating area. Opportunities for visitation are rare and in all events are conducted through glass walls. It is fair to say OSP inmates are deprived of almost any environmental or sensory stimuli and of almost all human contact.
>
> Aside from the severity of the conditions, placement at OSP is for an indefinite period of time, limited only by an inmate's sentence. For an inmate serving a life sentence, there is no indication how long he may be incarcerated at OSP once assigned there. *Austin I, supra*, at 740. Inmates otherwise eligible for parole lose their eligibility while incarcerated at OSP. 189 F.Supp.2d, at 728.

*Wilkinson*, 545 U.S. at 210-11. The Court considered, as *Sandin* directs, whether these conditions were significant and atypical compared to the ordinary incidents of prison life. The Court acknowledged the difficulty in "identifying the baseline from which to measure what is atypical and significant . . . ." *Id*. at 223. Nonetheless, the Court concluded that at least some of the restrictions imposed in Ohio's "Supermax" were atypical and significant "under any plausible baseline." *Id*. The Court declared that the specific restrictions that rendered confinement in "Supermax" atypical and significant were:

> almost all human contact is prohibited, even to the point that conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24 hours; exercise is for 1 hour per day, but only in a small indoor room. Save perhaps for the especially severe limitations on all human contact, these conditions likely would apply to most solitary confinement facilities, but here there are two added components. First is the duration. Unlike the 30-day placement in *Sandin,* placement at OSP is indefinite and, after an initial 30-day review, is reviewed just annually. Second is that placement disqualifies an otherwise eligible inmate for parole consideration. *Austin I*, 189 F. Supp. 2d, at 728. While any of these conditions standing alone might not be sufficient to create a liberty interest, taken together they impose an atypical and significant hardship within the correctional context. It follows that respondents have a liberty interest in avoiding assignment to OSP. *Sandin*, *supra*, at 483.

*Id*. at 223-24.

Two months after the Supreme Court issued the *Wilkinson* opinion, the Sixth Circuit considered whether the restrictions that followed the STG designations (I and II) were significant and atypical under *Sandin*. *Harbin-Bey*, 420 F.3d at 576-77. The court held that they were not atypical and significant and that, therefore, the plaintiff did not have a liberty interest

14

protected by the Fourteenth Amendment Due Process Clause and Plaintiff's complaint was properly dismissed upon initial review. *Id*.

Four years later, in *Heard v. Caruso*, 351 F. App'x 1 (6th Cir. 2009) (unpublished), the Sixth Circuit again considered the restrictions that followed the STG II designation. In *Heard*, however, the plaintiff had supplemented his complaint to include allegations that parroted some of the language *Wilkinson* Court used to describe Ohio's "Supermax" restrictions.[4] The court of appeals concluded those allegations warranted factual inquiry along the lines of that conducted by the Supreme Court in *Wilkinson*.

On remand, this Court granted summary judgment in the *Heard* defendants' favor on Heard's due process claim. *Heard v. Caruso*, No. 2:05-cv-231 (W.D. Mich. Aug. 30, 2011) (ECF No. 410). The Court found that the restrictions attendant to the STG II designation did not rise to the level of the "Supermax" restrictions that the *Wilkinson* Court found warranted due process protections. Specifically, this Court found that the STG II restrictions did not extremely isolate the prisoners or disqualify them from parole. This Court concluded, therefore, that due

---

[4] Prisoner Heard's supplemental allegations were as follows:

> Security Threat Group designations to status II result in plaintiff being placed in a maximum security prison, which is the most secured of all Michigan Department of Corrections prisons; but plaintiff does not challenge the increase in classification as a result of the STG designation. The challenge is to the atypical and significant hardships place[d] on plaintiff as a result of the designation that trigger due process. The designations are indefinite and paroles are automatically denied, there are only five minute showers (which include washing and drying off); visits are restricted to two one hour non-contacts visits per month; and all human contact is limited to yard, dining hall, library and religious service which culminate to a potential maximum of 21 hours out [of] the cell per week. Cell to cell communication is prohibited, the lights, though [they] may be dimmed at night, [are] on 24 hours a day. These conditions are not ordinary conditions in the life of a prisoner in lower levels (1-4) in MDOC.

*Heard*, 351 F. App'x at 8-9. Heard also suggested that the designation disqualified him from parole. *Id.* Plaintiff Clark's allegations reproduce Prisoner Heard's supplemental allegations, almost word-for-word. (Compl., ECF No. 1, PageID.28.) Plaintiff has softened Heard's allegations a little bit: where Heard suggested the STG II designation disqualified a prisoner from parole, Plaintiff Clark states that "[p]aroles are almost automatically denied." (*Id.*)

process protection for the STG II designation was not required. (2:05-cv-231, ECF No. 410 PageID.2470.)[5]

Plaintiff has attempted to make his description of the STG II restrictions seem more like *Wilkinson* than *Harbin-Bey*, just as Prisoner Heard did. The attempt cannot succeed. Two of the key factors that prompted the *Wilkinson* Court to conclude that due process protected the "Supermax" classification—parole disqualification and extreme isolation—are not present here. Without those factors, the conditions of confinement for prisoners designated STG II are not significant and atypical departures from the normal incidents of prison life. Accordingly, Plaintiff has failed to identify a protected liberty interest and he has failed to state a claim for violation of his due process rights.

## **Conclusion**

Having conducted the review required by the Prison Litigation Reform Act, the Court determines that Plaintiff's complaint will be dismissed for failure to state a claim, under 28 U.S.C. §§ 1915(e)(2) and 1915A(b), and 42 U.S.C. § 1997e(c). The Court must next decide whether an appeal of this action would be in good faith within the meaning of 28 U.S.C. § 1915(a)(3). *See McGore v. Wrigglesworth*, 114 F.3d 601, 611 (6th Cir. 1997). The Court does not certify that an appeal would not be in good faith.

Should Plaintiff appeal this decision, the Court will assess the $505.00 appellate filing fee pursuant to § 1915(b)(1), *see McGore*, 114 F.3d at 610-11, unless Plaintiff is barred from

---

[5] The Sixth Circuit Court of Appeals affirmed this Court's summary judgment on that claim. *Heard v. Caruso*, No. 12-1517 (6th Cir. Mar. 12, 2013) (*Heard II*). The court of appeals did not consider whether Plaintiff had a liberty interest; instead, the court reasoned that even if he did have such an interest, he received all of the process he was due. *Heard II*, at p. 6 (No. 2:05-cv-231, ECF No. 442.)

16

proceeding *in forma pauperis*, *e.g.*, by the "three-strikes" rule of § 1915(g). If he is barred, he will be required to pay the $505.00 appellate filing fee in one lump sum.

This is a dismissal as described by 28 U.S.C. § 1915(g).

A judgment consistent with this opinion will be entered.


Dated:    February 18, 2020       /s/ Robert J. Jonker                      
                                                                            ROBERT J. JONKER
                                                                            CHIEF UNITED STATES DISTRICT JUDGE